Mark Connot (10010)
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas Nevada 89135
Telephone: 702.262.6899
Fax: 702.597.5503
mconnot@foxrothschild.com

John Shaeffer (*admitted PHV*)
Jeff Grant (*admitted PHV*)
**FOX ROTHSCHILD LLP**
1800 Century Park East, Suite 300
Los Angeles, California 90067-1506
Telephone: 310.598.4150
Fax: 310.556.9828
jshaeffer@foxrothschild.com
jgrant@foxrothschild.com

William Rudy (*admitted PHV*)
**FOX ROTHSCHILD LLP**
1225 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: 303.292.1200
Fax: 303.292.1300
wrudy@foxrothschild.com

*Attorneys for Plaintiffs Pharma Tech Solutions, Inc.
And Decision IT Corp.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PHARMA TECH SOLUTIONS, INC. and DECISION IT CORP., | Case No.: 2:16-cv-00564-RFB-PAL |
| Plaintiff, | **DECLARATION OF JOHN SHAEFFER IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| LIFESCAN, INC., LIFESCAN SCOTLAND, LTD. and JOHNSON AND JOHNSON | |
| Defendants. | |

DECLARATION OF JOHN SHAEFFER
IN OPPOSITION TO MOTION TO DISMISS
1

I, John Shaeffer, declare:

1.       I am an adult individual and make this Declaration based on personal knowledge.  I am a partner with the law firm Fox Rothschild LLP and am counsel of record for Plaintiffs Pharma Tech Solutions, Inc. and Decision IT Corp. ("Plaintiffs").  I have personal knowledge of the facts set forth in this Declaration unless otherwise stated.  If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

2.       Attached hereto as Exhibit A is a true and correct copy of the settlement agreement that resulted in the dismissal of all claims in lawsuits filed in the United States District Court for the Northern District of California by Lifescan Scotland, Ltd. and Lifescan, Inc., Case Nos. 11-cv-04494 and 12-cv-006360. In accordance with Paragraph 9.2 of the agreement, the settlement dollar figure has been redacted.

3.       Attached hereto as Exhibit B is a true and correct copy of an ORDER IMPOSING SANCTIONS AGAINST LIFESCAN PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37 that was signed and filed on November 6, 2013, by the United States District Court for the Northern District of California in Case No. 11-cv-04494.

4.       Attached hereto as Exhibit C is a collection of statements concerning the operation of the One Touch Ultra meters and test strips.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of September, 2016 at Los Angeles, California.

John Shaeffer

EXHIBIT "A"

## Settlement Agreement and Mutual Release

This Settlement Agreement and Mutual Release ("**Agreement**") is made between LifeScan Scotland, Ltd., and LifeScan, Inc., (collectively "**LifeScan**") and PharmaTech Solutions, Inc., and Decision Diagnostics Corp. (collectively "**PharmaTech**"). LifeScan and PharmaTech are collectively referred to as the "**Parties**."

This Agreement is effective on the date that the last of the Parties signs it ("**Effective Date**").

### Background

LifeScan is adverse to PharmaTech in two cases that are pending in the U.S. District Court for the Northern District of California, captioned *LifeScan, Inc., et al. v. PharmaTech Solutions, Inc., et al.*, No. 3:11-cv-04494-WHO (the "**4494 Case**") and *LifeScan, Inc., et al. v. PharmaTech Solutions, Inc., et al.*, No. 3:12-cv-006360-WHO (the "**6360 Case**"). The Parties want to resolve both of these cases, including all claims and counterclaims they have asserted or may assert in either case.

The Parties do not want to resolve a third matter involving some of the same parties and currently pending in the U.S. District Court for the District of Nevada, captioned *Pharma Tech Solutions, Inc., et al. v. LifeScan, Inc., et al.*, No. 2:16-cv-00564 (the "**564 Case**").

LifeScan also does not want to waive a pending appeal in the U.S. Court of Appeals for the Federal Circuit, captioned *LifeScan Scotland, Ltd. v. PharmaTech Solutions, Inc.*, No. 2015-1149 ("**1149 Appeal**"). LifeScan is appealing a decision by the U.S. Patent and Trademark Office invalidating U.S. Patent 7,250,105 (the "'**105 Patent**") after an *inter partes* review (No. IPR2013-00247). If the patentability of the '105 Patent is ultimately upheld, LifeScan agrees to conditionally grant PharmaTech a license under the '105 Patent.

Now, therefore, in consideration of the mutual promises and covenants contained in this Agreement, the Parties agree as follows:

**1.      Additional Definitions**

**1.1.**      "**Affiliate**" means any entity that, on or after the Effective Date of this Agreement (but only while such ownership or control exists), directly or indirectly controls, is controlled by, or is under common control with another entity. For the purpose of this definition, "control" means the possession, direct or indirect, of at least 50% of the voting stock or other ownership interest of the other entity; the power to direct or cause the direction of the management and policies of the other entity; or the power to elect or appoint at least 50% of the members of the governing body of the other entity through the ownership of the outstanding voting securities, by contract, or otherwise.

**1.2.**      "**Conditionally Licensed Product**" means the blood glucose test strips that received a 510(k) clearance on November 30, 2012: 510(k) No. K103542.

**1.3.**      "**Patent Office**" means the U.S. Patent and Trademark Office.

**2.      Consent Judgments; Contract in Lieu of Injunction**

**2.1.      Consent judgments**. Within three business days of the Effective Date, the Parties must file: (a) the consent judgment in the 4494 Case that is attached to this Agreement as Exhibit A; and (b) the consent judgment in the 6360 Case that is attached to this Agreement as Exhibit B.

**2.2.      Contract in lieu of injunction**. At the same time the Parties enter into this Agreement, the Parties must also sign the contract attached to this Agreement as Exhibit C. That contract becomes effective on the date the Court enters the consent judgment in the 6360 Case.

**3.      Payment**

By May 30, 2016, LifeScan will pay PharmaTech ███████ by wire transfer. PharmaTech's counsel has provided wiring instructions to LifeScan's counsel so that this

payment can be made. If for any reason this Agreement has not become effective by May 30, 2016, payment is deferred until 10 days after the Effective Date.

**4.   Preservation of claims in the 564 Case**

Nothing in this Agreement affects the patent claims that PharmaTech has asserted against LifeScan in the 564 Case; the counterclaims that LifeScan may assert in the 564 Case arising out of the same transactions or series of events, such as noninfringement, invalidity and unenforceability; or any actions that LifeScan may file in the Patent Office regarding the patents at issue in the 564 Case. For avoidance of doubt, this preservation of claims does not permit PharmaTech to amend the complaint in the 564 Case to add any claims released in Section 6.2 or permit LifeScan to assert as counterclaims any claims released in Section 6.1.

**5.   Preservation of appeal from *inter partes* review; license on condition appeal is successful**

**5.1.**   Nothing in this Agreement affects LifeScan's ability to pursue the 1149 Appeal or otherwise seek a ruling by the Patent Office affirming the validity of the '105 Patent.

**5.2.**   If the Patent Office affirms the patentability of any claim of the '105 Patent after the conclusion of any appeals, then PharmaTech shall have a non-exclusive, fully paid license under the '105 Patent to import, make, use, sell or offer to sell the Conditionally Licensed Product in the United States.

**5.3.**   The conditional license described in the preceding Section 5.2 will be non-transferrable and will not include the right to assign or sub-license without the written consent of LifeScan, and any such purported transfer shall be void.

**6.   Releases**

**6.1.   Releases by LifeScan**. LifeScan, on behalf of itself and its present Affiliates, predecessors, successors, assigns, agents, officers, directors, and attorneys,

3

whether such person is or was named, identified, or represented in the referenced pending actions herein, fully and forever releases, acquits and discharges PharmaTech Solutions, Inc., Decision Diagnostics Corp., and their present Affiliates and their respective directors, officers, employees, agents, insurance companies, and attorneys, from any claim, suits, liens, damages, judgments, duty, obligation or cause of action, and demands of every nature, kind, and description whatsoever, in law or in equity, whether presently known or unknown, suspected or unsuspected, arising from the beginning of time to the Effective Date of this Agreement, except for those claims specifically preserved in Sections 4 and 5, above. In particular, this includes any claims for patent infringement, false advertising, false endorsement, trademark infringement, or unfair competition that could be brought as of the Effective Date.

6.2.    **Releases by PharmaTech**. PharmaTech, on behalf of itself and its present Affiliates, predecessors, successors, assigns, agents, officers, directors, and attorneys, whether such person is or was named, identified, or represented in the referenced pending actions herein, fully and forever releases, acquits and discharges LifeScan, Inc., LifeScan Scotland, Ltd., and their present Affiliates and their respective directors, officers, employees, agents, insurance companies, and attorneys, from any claim, suits, liens, damages, judgments, duty, obligation or cause of action, and demands of every nature, kind, and description whatsoever, in law or in equity, whether presently known or unknown, suspected or unsuspected, arising from the beginning of time to the Effective Date of this Agreement, except for those claims specifically preserved in Section 4, above. In particular, this includes any claims for antitrust violations, false advertising, or unfair competition that could be brought as of the Effective Date.

6.3.    **Risk of unknown claims**. The Parties acknowledge the risk that after executing this Agreement they may discover, incur, or suffer claims that existed but were unknown or unanticipated at the time of executing this Agreement. If known by the Parties at that time, these claims may have materially affected their respective decisions to execute

4

this Agreement. The Parties expressly assume the risk of such unknown and unanticipated claims and agree that the releases provided in Sections 6.1 and 6.2 of this Agreement apply to all such claims.

    6.4.    **Further release**. The Parties acknowledge that the consideration exchanged in this Agreement is intended to and will release and discharge any claim, demand, liability, and cause of action, in law or equity, including any unknown or future damages, loss or injury related to the released claims, and that they, and each of them, have read and do hereby waive any rights under, California Civil Code § 1542 (or similar law of any other state or jurisdiction. Section 1542 reads as follows:

> A GENERAL RELEASE DES NOT EXTEND TO CLAIMS WHICH THE
> CREDITOR DOES NOT KNOW SUSPECT TO EXIST IN HIS OR HER
> FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF
> KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED
> HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Parties acknowledge, warrant and represent that they are familiar with Section 1542 (or similar law of any other state or jurisdiction) and that the effect and import of that provision has been fully explained to them by their respective counsel. The Parties acknowledge that there is a risk that after executing this Agreement, one or more of them will incur or suffer losses, damages, or injuries related to the released claims which are unknown and unanticipated at the time this Agreement is signed. The Parties, and each of them, hereby assume the above-mentioned risks and understand that this Agreement shall apply to all unknown or unanticipated claims, losses, damages or injuries relating to the released claims, as well as those known and anticipated, and upon advice of legal counsel, the Parties, and each of them, hereby waive any and all rights under the aforesaid Section 1542. The Parties acknowledge that they fully understand that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the released claims, but that it is their intention hereby to fully, finally and

forever release all claims, obligations and matters released herein, known or unknown, suspected or unsuspected, which do exist, may exist in the future or heretofore have existed between the releasing Parties and the released Parties relating to the released claims, and that in furtherance of such intention, the releases given herein are and remain in effect as full and complete releases of claims relating to the released claims, notwithstanding the discovery or existence of any such additional or different facts.

7. **Term**

This Agreement will commence on the Effective Date and will continue to be effective until March 8, 2020—the date the '105 Patent is scheduled to expire. The Parties' rights and obligations under Section 2.2 (contract in lieu of injunction), Section 6 (Releases), Section 9 (Confidentiality), and Section 11 (Miscellaneous) will survive the expiration of this Agreement.

8. **Representations and Warranties**

**8.1.** Each Party to this Agreement represents and warrants that it has all requisite power and authority to enter into this Agreement, and to otherwise carry out the transactions and perform its obligations as contemplated by this Agreement.

**8.2.** Each Party represents and warrants that it has received, or had the opportunity to receive, independent legal advice from counsel regarding the meaning and legal effect of this Agreement and regarding the advisability of entering this Agreement and fully understands the same.

**8.3.** LifeScan represents and warrants that, as of April 28, 2016, it had no plans to communicate with the U.S. Food and Drug Administration about any of PharmaTech's products. LifeScan reserves the rights to make such communications in the future.

9. **Confidentiality**

**9.1.** This Agreement is not confidential except as set forth in Section 9.2 and may be disclosed in whole or in part without prior notice to the other Party.

6

**9.2.** The amount of the payment listed in Section 3 (Payment) is confidential. The Parties must keep that amount confidential and shall not now or hereafter divulge that amount except (a) with the written consent of the other Parties; (b) to any governmental body or judicial entity having jurisdiction and calling for such disclosure; (c) as otherwise may be required by law, a court of competent jurisdiction, or the rules and regulations of the U.S. Securities and Exchange Commission (SEC) or the rules of an applicable stock exchange; (d) to legal counsel representing a Party; (e) to the independent outside auditors of a party; or (f) to any Third Party who is a bona fide potential or actual successor in any right, title or interest in all or any portion of a Party's business. Although the specific amount listed in Section 3 (Payment) is confidential, the Parties are free to publicly characterize that amount in any manner they wish.

**9.3.** If disclosure of the amount of the payment listed in Section 3 is required by law or a court of competent jurisdiction, the disclosing Party shall must reasonable efforts to preserve the confidentiality of the contents of that section, including: (a) consulting with the non-disclosing Party; and (b) taking reasonable steps to ensure that the disclosure is treated as confidential under a protective order. The receiving Party shall use the same degree of care to protect the contents of Section 3 from unauthorized use or disclosure as it would use to protect its own information of a similar nature, but in no event with less than reasonable care.

## 10.   Dispute Resolution

**10.1.** Except with regard to the contract in lieu of injunction that is the subject of Section 2.2, in the event of any dispute relating to this Agreement, each Party waives: (1) its right to trial by jury; (2) any claim to punitive, exemplary, multiplied, indirect, consequential or lost-profits/revenues damages; and (3) any claim for attorneys' fees, costs and prejudgment interest. As for the contract in lieu of injunction described in Section 2.2,

that contract has its own dispute-resolution procedures that are not affected by the procedures set forth in this Agreement.

    **10.2.**    Each Party has the right to seek provisional remedies, including preliminary injunctive relief or a temporary restraining order, for an alleged violation of this Agreement, to avoid irreparable harm or maintain the status quo under this Agreement. Such relief shall be sought in the U.S. District Court for the Northern District of California, where both Parties consent to personal jurisdiction.

**11.**    **Miscellaneous**

    **11.1.**    **Applicable law.** This Agreement is governed and construed in accordance with the laws of the State of California without regard to that state's conflict of law provisions.

    **11.2.**    **Entire Agreement.** This Agreement represents the entire Agreement between the parties and supersedes all prior negotiations, representations, or agreements, written or oral.

    **11.3.**    **Modifications and Waiver.** No modification of this Agreement will be effective unless in writing and signed by all Parties. No waiver of any right set forth herein will be effective unless in writing and signed by the Party against whom enforcement of the waiver is sought. Any failure on the part of a Party to enforce any provisions of this Agreement will not waive such provisions or of any right of such Party thereafter to enforce each and every such provision.

    **11.4.**    **No Admission of Liability.** This Agreement is entered into for purposes of settlement and compromise only. Neither this Agreement nor anything contained herein, nor any act or thing done in connection herewith, is intended to be or shall be construed or deemed to be, an admission of any Party of liability, fault or wrongdoing, or an admission of any Party of any fact, allegation, or claim whatsoever, including any fact, allegation or claim alleged by any Party in or in connection with any matters released herein

**11.5.    Severability**. Should any part of this Agreement be held unenforceable, invalid or illegal, the validity of the remaining part or provisions will not be affected. In such case, the Parties must use their respective reasonable efforts to replace the invalid provisions in a manner that best accomplishes the original intentions of the parties.

**11.6.    No Third-Party Beneficiaries**. Nothing in this Agreement, expressed or implied, confers on any person other than the Parties or their respective successors or assigns, any rights, remedies, obligations or liabilities.

**11.7.    Notices**. Any notices given under this Agreement must be in writing and sent by a first-rate courier, prepaid, with confirmed receipt, addressed to the Parties at their addresses shown below (or any other address as the Parties may notify each other of in writing):

**If to LifeScan:**

LifeScan, Inc.
Worldwide President
965 Chesterbrook Boulevard
Wayne, Pennsylvania 19087
Facsimile No. 484-885-2360

With a simultaneous copy (which shall not constitute notice) to:

Johnson & Johnson
Attn.: Chief Intellectual Prop. Counsel
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Facsimile No. 732-524-2138

**If to PharmaTech:**

PharmaTech Solutions, Inc.
Attn. Keith Berman, President
2660 Townsgate Road #300
Westlake Village, CA  91361

**11.1.    Counterparts**. This Agreement may be executed in multiple counterparts, all of which take together will be regarded as one and the same instrument.

9

## 12.    Signatures

LifeScan, Inc.

By: _Valerie Asbury_
Name: _Valerie Asbury_
Title: _President_
Date: _May 12, 2016_

LifeScan Scotland, Ltd.

By: _____
Name: _____
Title: _____
Date: _____

PharmaTech Solutions, Inc.

By: _____
Name: _____
Title: _____
Date: _____

Decision Diagnostics Corp.

By: _____
Name: _____
Title: _____
Date: _____

10

## 12.    Signatures

LifeScan, Inc.

By: _____
Name: _____
Title: _____
Date: _____

LifeScan Scotland, Ltd.

By: _____
Name: DAVID McMILLAN
Title: MANAGING DIRECTOR
Date: 12 MAY 2016

PharmaTech Solutions, Inc.

By: _____
Name: _____
Title: _____
Date: _____

Decision Diagnostics Corp.

By: _____
Name: _____
Title: _____
Date: _____

## 12.    Signatures

LifeScan, Inc.

By: _____
Name: _____
Title: _____
Date: _____

LifeScan Scotland, Ltd.

By: _____
Name: _____
Title: _____
Date: _____

PharmaTech Solutions, Inc.

By: _____
Name:    Keith Berman
Title:    President
Date:    5/11/2016

Decision Diagnostics Corp.

By: _____
Name:    Keith Berman
Title:    PEO
Date:    5/11/16

Exhibit A

Gregory L. Diskant (admitted *pro hac vice*)
Eugene M. Gelernter (*admitted pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone:  (212) 336-2000
Facsimile:  (212) 336-2222
E-Mail:  gldiskant@pbwt.com
           emgelernter@pbwt.com

Charles Hoffmann (admitted *pro hac vice*)
Sean Marshall (admitted *pro hac vice*)
HOFFMANN MARSHALL STRONG LLP
116 West 23rd Street
New York, NY  10011
Telephone:  (212) 851-8403
Email:  charlie@hms.com
          sean@hms.com

Sue Roeder (S.B. #160897)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA  94025
Telephone:  (650) 473-2600
Facsimile:  (650) 473-2601
E-Mail:  sroeder@omm.com

*Attorneys for Plaintiffs LifeScan, Inc,
and LifeScan Scotland, Ltd.*

William Rudy (admitted *pro hac vice*)
John J. Shaeffer (S.B. # 138331)
Jeff Grant (S.B. # 218974)
FOX ROTHSCHILD LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Telephone:  (310) 598-4150
Facsimile:  (310) 556-9828
Email:  jshaeffer@foxrothchild.com
          wrudy@foxrothchild.com
          jgrant@foxrothchild.com

*Attorneys for Defendants Decision Diagnostics
Corp. and PharmaTech Solutions, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| LIFESCAN, INC. and LIFESCAN SCOTLAND, LTD.,<br><br>             Plaintiffs,<br><br>      v.<br><br>DECISION DIAGNOSTICS CORP., and PHARMATECH SOLUTIONS, INC.,<br>             Defendants. | Case No. 3:11-cv-04494-WHO<br><br>**CONSENT JUDGMENT AND ORDER ON INJUNCTION BOND** |

1

2      WHEREAS, Plaintiffs LifeScan, Inc. and LifeScan Scotland, Ltd. (collectively, "LifeScan")

3   and Defendants Decision Diagnostics Corp. and PharmaTech Solutions, Inc. (collectively

4   "PharmaTech") have settled and resolved the disputes between them in this lawsuit, and consent to

5   this Judgment and Order,

       IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

6      (1)     This Court has jurisdiction over the parties and subject matter of this action.

7      (2)     All of LifeScan's claims in this action against PharmaTech, and all of PharmaTech's

8   counterclaims in this action against LifeScan, are hereby DISMISSED WITH PREJUDICE, without

9   costs or attorneys' fees to any party.

10     (3)     The preliminary-injunction bond posted on behalf of LifeScan [Dkt-280] is hereby

11  EXONERATED with all funds returned to LifeScan's surety.

12     (4)     LifeScan and PharmaTech agree not to appeal from this Judgment and Order, and

13  waive all right to do so.

14

15  IT IS SO ORDERED on May __, 2016 and JUDGMENT IS ENTERED ACCORDINGLY

16

17                                      /
                                 _____
18                                U.S. District Judge

19
       LifeScan and Shasta agree through their undersigned counsel to the entry of this Judgment
20  and Order:

21  | /s/ Gregory L. Diskant | /s/ William Rudy |
    |---|---|
22  | Gregory L. Diskant (admitted *pro hac vice*) | William Rudy (admitted *pro hac vice*) |
    | Eugene M. Gelernter (admitted pro hac vice) | John J. Shaeffer (S.B. # 138331) |
23  | PATTERSON BELKNAP WEBB & TYLER LLP | Jeff Grant (S.B. # 218974) |
    | | FOX ROTHSCHILD LLP |
24  | *Attorneys for Plaintiffs LifeScan, Inc.* | |
    | *and LifeScan Scotland, Ltd.* | *Attorneys for Defendants Decision Diagnostics* |
25  | | *Corp. and PharmaTech Solutions, Inc..* |
    | Dated:  May 12, 2016 | |
26

27

28                                      -2-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I attest that I have received and have on file written permission to sign this Consent Judgment from all parties whose signatures are indicated by a "conformed" signature (/s/) within this e-filed document.

/s/ Eugene M. Gelernter
Eugene M. Gelernter (admitted *pro hac vice*)

Dated: May 12, 2016

-3-

CONSENT JUDGMENT & ORDER ON INJUNCTION BOND
CASE NO. 3:11-cv-04494-WHO

Exhibit B

Gregory L. Diskant (admitted *pro hac vice*)
Eugene M. Gelernter (*admitted pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
E-Mail: gldiskant@pbwt.com
        emgelernter@pbwt.com

Charles Hoffmann (admitted *pro hac vice*)
Sean Marshall (admitted *pro hac vice*)
HOFFMANN MARSHALL STRONG LLP
116 West 23rd Street
New York, NY  10011
Telephone: (212) 851-8403
Email: charlie@hms.com
        sean@hms.com

Sue Roeder (S.B. #160897)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA  94025
Telephone: (650) 473-2600
Facsimile: (650) 473-2601
E-Mail: sroeder@omm.com

*Attorneys for Plaintiffs LifeScan, Inc,
and Johnson and Johnson*

William Rudy (admitted *pro hac vice*)
John J. Shaeffer (S.B. # 138331)
Jeff Grant (S.B. # 218974)
FOX ROTHSCHILD LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Telephone: (310) 598-4150
Facsimile: (310) 556-9828
Email: jshaeffer@foxrothchild.com
        wrudy@foxrothchild.com
        jgrant@foxrothchild.com

*Attorneys for Defendants Decision Diagnostics
Corp. and PharmaTech Solutions, Inc..*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

LIFESCAN, INC. and JOHNSON AND
JOHNSON,

                              Plaintiffs,

        v.

DECISION DIAGNOSTICS CORP. and
PHARMATECH SOLUTIONS, INC.
                              Defendants.

Case No. 3:12-cv-006360-WHO

**CONSENT JUDGMENT AND
ORDER ON INJUNCTION BOND**

1    WHEREAS, Plaintiffs LifeScan, Inc. and Johnson and Johnson (collectively, "LifeScan")

2  and Defendants Decision Diagnostics Corp. and PharmaTech Solutions, Inc. (collectively

3  "PharmaTech") have settled and resolved the disputes between them in this lawsuit, and consent to

4  this Judgment and Order,

5    IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

6    (1)    This Court has jurisdiction of the parties and subject matter of this action.

7    (2)    All of LifeScan's claims in this action against PharmaTech, and all of PharmaTech's

8  counterclaims in this action against LifeScan, are hereby DISMISSED WITH PREJUDICE, without

9  costs or attorneys' fees to any party.

10    (3)    The preliminary injunction in this action [Dkt. 94], as modified by Order dated June

11  24, 2013 [Dkt. 110], is hereby DISSOLVED.

12    (4)    The preliminary-injunction bond posted on behalf of LifeScan [Dkt. 111] is hereby

13  EXONERATED with all funds returned to LifeScan's surety.

14    (5)    LifeScan and PharmaTech agree not to appeal from this Judgment and Order, and

15  waive all right to do so.

16

17  IT IS SO ORDERED on May __, 2016 and JUDGMENT IS ENTERED ACCORDINGLY:

18

19  _____U.S. District Judge

20

21    LifeScan and PharmaTech agree through their undersigned counsel to the entry of this

    Judgment and Order:

| */s/ Gregory L. Diskant*<br>Gregory L. Diskant (admitted *pro hac vice*)<br>Eugene M. Gelernter (admitted *pro hac vice*)<br>PATTERSON BELKNAP WEBB & TYLER LLP<br><br>*Attorneys for Plaintiffs LifeScan, Inc.*<br>*and Johnson and Johnson*<br><br>Dated:  May 12, 2016 | */s/ William Rudy*<br>William Rudy (admitted *pro hac vice*)<br>John J. Shaeffer<br>FOX ROTHSCHILD LLP<br><br>*Attorneys for Defendants Decision Diagnostics*<br>*Corp. and PharmaTech Solutions, Inc..* |

-2-

I attest that I have received and have on file written permission to sign this Consent Judgment from all parties whose signatures are indicated by a "conformed" signature (/s/) within this e-filed document.

/s/ Eugene M. Gelernter
Eugene M. Gelernter (admitted *pro hac vice*)

Dated: May 12, 2016

-3-

Exhibit C

# AGREEMENT

This Agreement, effective as of _____, is made by and between Johnson & Johnson, LifeScan Scotland LTD, and LifeScan, Inc. (collectively, "LifeScan"), and Decision Diagnostics Corp. and PharmaTech Solutions, Inc. (collectively, "DDC"). Johnson & Johnson is a corporation with offices at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933; LifeScan Scotland LTD is a corporation with offices at Beechwood Park North, Inverness, IV2 3ED; LifeScan, Inc. is a corporation with offices at 965 Chesterbrook Blvd., Wayne, PA 19087; Decision Diagnostics Corp. is a corporation with offices at 2660 Townsgate Road, Suite 300, Westlake Village, California 91361; and PharmaTech Solutions, Inc. is a corporation with offices at 2660 Townsgate Road, Suite 300, Westlake Village, California 91361.

WHEREAS, on or about December 14, 2012, LifeScan brought false advertising claims against DDC and sought a preliminary injunction to enjoin DDC from using certain GenStrip packaging, labeling, and advertisements; and

WHEREAS, on or about May 21, 2013, the Northern District of California granted LifeScan a preliminary injunction that barred DDC from using the images, logos, or stylized font of LifeScan's OneTouch meters on the packaging, labels, and advertisements for the GenStrip, *see* Order Granting Motion for Preliminary Injunction, CV12-6360 N.D. Cal., Dkt. No. 94; and

WHEREAS, on or about June 24, 2013, the Northern District of California modified its preliminary injunction, *see* Order Modifying Injunction; Denying Motion to Stay; Setting Bond; Granting Motions to Seal, CV12-6360 N.D. Cal., Dkt. No. 110; and

WHEREAS, on or about January 8, 2014, the Ninth Circuit affirmed the Northern District of California's preliminary injunction decisions, *see* Memorandum, No. 13-16042 9th Cir. Dkt. No. 35-1; and

WHEREAS, the Parties have entered into a separate settlement agreement that resolves all aspects of the cases pending in the Northern District of California that bore civil action numbers CV12-6360 and CV11-04494; and

WHEREAS, the Parties intend for this Agreement to enforce the terms of the Northern District of California's modified preliminary injunction, *see* CV12-6360 N.D. Cal., Dkt. No. 110; and

NOW THEREFORE, in consideration of the foregoing premises, the mutual covenants and promises set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## 1.   DEFINITIONS

**1.1**   "Party" means LifeScan or DDC.

**1.2**   "Parties" means LifeScan and DDC.

1.3    Reference to "LifeScan" includes LifeScan's successors, assigns, affiliates, parents, subsidiaries, agents, servants, officers, directors, employees, heirs, executors, and representatives.

1.4    Reference to "DDC" includes DDC's successors, assigns, affiliates, parents, subsidiaries, agents, servants, officers, directors, employees, heirs, executors, and representatives.

1.5    "GenStrip" means any glucose test strip product marketed by DDC, including the GenStrip50 and the GenUltimate.

2.     **USE OF LIFESCAN'S INTELLECTUAL PROPERTY RELATING TO THE ONETOUCH METER AND/OR BRAND**

2.1    DDC shall not use any image of LifeScan's OneTouch meters, or LifeScan's OneTouch logos or stylized font, on the packaging or labels for the GenStrip.  DDC may continue to use the current FDA-approved GenStrip package insert, which includes images of the OneTouch UltraMini meter.

2.2    DDC shall not use any image of LifeScan's OneTouch meters, or use LifeScan's OneTouch logos or stylized font, in advertisements for the GenStrip, whether online or not, except that DDC may use images of LifeScan's OneTouch Ultra, Ultra II, and UltraMini meters in their advertisements if they:  (i) use no more than is reasonably necessary to demonstrate the correct manner of use of the GenStrip, and (ii) do nothing in conjunction with that use that suggests sponsorship or endorsement by LifeScan or Johnson & Johnson.

2.3    In any advertisement in which DDC uses any image of any OneTouch meter, DDC must include, immediately adjacent to the image of the meter (or part of a meter), a prominent disclaimer of endorsement by or affiliation with LifeScan and Johnson & Johnson.  If the image is used in a print advertisement or on a web page, the disclaimer must be clear and conspicuous and must be in the same type (with respect to size and boldness) as is used generally in the advertisement.  If the image is used in a television or online video advertisement, DDC must include both a clear, conspicuous text disclaimer that is displayed for at least four seconds, and a voiceover in which the text of the disclaimer is read at the same speed and volume as other speech in the advertisement.

2.4    Additionally, DDC shall not ship to consumers the 60,000 GenStrip units referenced in the Court's May 21, 2013 Order Granting a Preliminary Injunction, *see* CV12-6360 N.D. Cal., Dkt. No. 110, without first removing the packaging containing LifeScan's logos and trade dress.

3.     **DISPUTES OVER THE TERMS AND/OR EFFECTS OF THIS AGREEMENT**

3.1    Each of the Parties represents and warrants that it is duly existing and that it has the full power and authority to enter into this Agreement, and that there are no other persons or entities whose consent to this Agreement or whose joinder herein is necessary to make fully effective the provisions of this Agreement.

2

3.2     Each Party acknowledges to the other Party that it has been represented by independent legal counsel of its own choice throughout all of the negotiations which preceded the execution of this Agreement and that it has executed this Agreement with the consent and on the advice of such independent legal counsel. Each Party further acknowledges that it and its counsel have had adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof. Each Party has authorized and directed their respective attorneys to execute and deliver such other and further documents as may be required to carry out the terms and conditions of this Agreement.

3.3     For all disputes arising from, relating to, or otherwise concerning the terms or effects of this Agreement, as well as any false advertising dispute between the Parties concerning the GenStrip, the Parties consent to continuing jurisdiction before the Court presiding over the case bearing civil action number CV12-6360, currently Judge William K. Orrick in the Northern District of California.

3.4     The Parties agree to waive any objection to jurisdiction or venue in any legal proceeding brought before the Court presiding over the case bearing civil action number CV12-6360 for all disputes arising from, relating to, or otherwise concerning the terms or effects of this Agreement, as well as any false advertising dispute between the Parties concerning the GenStrip.

3.5     The Parties hereby acknowledge that LifeScan would suffer irreparable harm in the event that DDC breaches the terms of this Agreement, and that monetary damages would be insufficient to remedy DDC's breach. The Parties agree that LifeScan would be entitled to injunctive relief and/or other equitable relief to enforce this Agreement and/or remedy DDC's breach.

3.6     The Parties further agree that any and all penalties for contempt under the Federal Rules of Civil Procedure or the Court's inherent powers are available to enforce this agreement and/or remedy its breach, including the imposition of monetary fees or other equitable relief that a Court may order to ensure compliance with its orders.

3.7     The Parties agree that in the event that DDC breaches this Agreement, LifeScan would be entitled upon proof of breach to monetary penalties sufficient to remedy the breach.

3.8     In any adversarial proceeding between the Parties arising out of this agreement, the prevailing party will be entitled to recover from the other party, in addition to any other relief awarded, all expenses that the prevailing party incurs in those proceedings, including attorneys' fees.

3.9     If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable under any controlling body of law, that provision shall be reformed, construed and enforced to the maximum extent permissible; and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

3

**3.10**    This is an enforceable Agreement, and constitutes the entire agreement between the Parties and supersede all previous communications, representations, agreements or understandings, either oral or written, between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto which specifically refers to this Agreement.

*[Remainder of Page Intentionally Left Blank]*

4

IN WITNESS WHEREOF, duly authorized representatives of the Parties have duly executed this Agreement.

**LifeScan, Inc.**                                    **Decision Diagnostics Corp.**

By_____            By_____
Name:                                                  Name:
Title:                                                   Title:

Date Signed : _____ __, 2016       Date Signed : _____ __, 2016

**LifeScan Scotland Ltd.**                       **PharmaTech Solutions, Inc.**

By_____            By_____
Name:                                                  Name:
Title:                                                   Title:

Date Signed : _____ __, 2016       Date Signed : _____ __, 2016

**Johnson & Johnson**

By_____
Name:
Title:

Date Signed : _____ __, 2016

5

EXHIBIT "B"

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LIFESCAN SCOTLAND, LTD., et al.,

Plaintiffs,

v.

SHASTA TECHNOLOGIES, LLC, et al.,

Defendants.

Case No. 11-cv-04494-WHO

ORDER IMPOSING SANCTIONS
AGAINST LIFESCAN PURSUANT TO
FEDERAL RULE OF CIVIL
PROCEDURE 37

Re: Dkt. No. 336

**INTRODUCTION**

Before the Court are the parties' responses to the Court's order to show cause why plaintiff LifeScan should not be held in contempt for violating the Protective Order in this case. The Court finds that LifeScan's violation of the protective order is sanctionable under Federal Rule of Civil Procedure 37 but does not constitute contempt. Accordingly, the Court orders LifeScan to pay the defendants' attorneys' fees in incurred in connection with LifeScan's violation of the Protective Order.

**BACKGROUND**

LifeScan owns various patents related to blood glucose testing, targeted at people with diabetes. LifeScan has developed and sells various products practicing its patents, including OneTouch Ultra glucose monitors and OneTouch Ultra "test strips" designed for use with the monitors. The defendants have developed and manufacture and sell a disposable test strip called the GenStrip, which is designed for use with LifeScan's OneTouch Ultra monitors. On September

1    9, 2011, LifeScan filed a patent infringement suit against the defendants, asserting that the

2    Genstrip infringes on LifeScan's patents.

3        LifeScan learned the identity of two of the defendants' distributors through material the

4    defendants designated "attorneys' eyes only," pursuant to the Protective Order governing the

5    disclosure of confidential material in this case. Dkt. No. 336.[1]  LifeScan used that information to

6    mail the distributors letters advising them of a preliminary injunction entered against the

7    defendants.  The letters also implied that the distributors were themselves subject to the

8    preliminary injunction, despite the absence of any evidence that the distributors were acting in

9    concert with the defendants or were otherwise subject to Federal Rule of Civil Procedure 65(d),

10   which provides that a preliminary injunction is binding only on the parties and those "who are in

11   active concert or participation" with them and who receive notice of the preliminary injunction.

12   The defendants assert that, as a result, they have been forced to buy back remaining inventory

13   from the distributors and their commercial relationships have suffered.

14        On August 28, 2013, the Court ordered LifeScan to show cause why it should not be held

15   in contempt for violating the Protective Order.  The Court also ordered the defendants to provide

16   the Court "the evidentiary basis for any monetary remedies sought." Dkt. No. 336 at 10.[2]

17        LifeScan asserts that a finding of civil contempt is not warranted because there was no

18   violation of the protective order, and even if there was, LifeScan's conduct was reasonable, in

19   good faith and in substantial compliance with the protective order.  LifeScan also asserts that if the

20   Court adheres to the view that the protective order was violated and that a monetary sanction is

21   appropriate, the Court should deny the motion for contempt and instead award a monetary penalty

22   as a sanction under Rule 37.  In response, the defendants note that the Court previously

23   determined that the protective order was violated and argue that LifeScan did not substantially

24   comply with the protective order.  The defendants argue that the Court should find LifeScan in

25   contempt and propose various remedies.

26

27   _____
     [1] A detailed background of the present dispute is set forth in the Court's August 28, 2013 order.
28   Dkt. No. 336.
     [2] Page citations to docket entries are to the ECF page numbers.

United States District Court
Northern District of California

**LEGAL STANDARD**

A party alleging civil contempt must establish that the accused party i) violated a court order, ii) beyond substantial compliance, iii) not based on a good faith and reasonable interpretation of the order, iv) by clear and convincing evidence. *See Labor/Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695 (9th Cir. 1993). "The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order. But a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693 at 695 (internal punctuation and quotations omitted). The Federal Circuit has stated that "[i]f there is a fair ground of doubt as to the wrongfulness of the defendant's actions said to be in contempt, the District Court should not entertain the civil contempt proceeding or find contempt." *Preemption Devices, Inc. v. Minnesota Min. & Mfg. Co.*, 803 F.2d 1170, 1173 (Fed. Cir. 1986).

**DISCUSSION**

**A.  LifeScan violated the Protective Order**

LifeScan argues in its response to the order to show cause that it did not violate the Protective Order because i) the identities of the defendants' distributors were "in the public domain" and ii) even if the identities were confidential, LifeScan's disclosure was permitted by the Protective Order because the information was disclosed in connection with prosecuting this litigation and to persons already aware of the information, given that the distributors already knew that they were the defendants' distributors.

The Court's order to show cause set forth in detail why LifeScan's conduct violated the Protective Order. See Dkt. No. 336. This was not a trivial or technical violation. As stated in that order, LifeScan concedes that it learned the identities of two of the defendants' distributors from confidential material. *Id.* at 2 (citing Dkt. No. 298 (Diskant Decl.) ¶ 20). The Court also previously rejected LifeScan's argument that its letters were for the purposes of *this* litigation. *See* Dkt. No. 336 at 6-9. LifeScan's effort to reargue these points is not persuasive and the Court will

3

1    not revisit its prior determination.

2    **B.  LifeScan's conduct does not warrant a contempt finding**

3         LifeScan asserts that its conduct does not constitute contempt because the defendants have

4    not established by clear and convincing evidence that it was unreasonable for LifeScan to believe

5    that the letters were permitted by the Protective Order because i) the identities of the defendants'

6    distributors were not confidential *or* because ii) the letters were part of "this litigation."

7         LifeScan's first argument is meritless.  The defendants have presented clear and

8    convincing evidence that it was unreasonable for LifeScan to believe that the identities of the

9    defendants' distributors were not subject to the Protective Order.  LifeScan concedes that it

10   learned the identities through information the defendants had designated for attorneys' eyes only.

11   Moreover, as stated in the order to show cause:

> Defendants expressly stressed their fears about producing the
> distributor information to LifeScan. Defense counsel told one of
> LifeScan's attorneys over the telephone that "Defendants were very
> concerned that Lifescan would misuse the purchaser orders and
> invoices, including to contact and bully Defendants' customers. I
> warned [counsel for LifeScan] against misusing the documents in a
> manner inconsistent with the protective order." This unheeded
> warning reinforces the Court's view that LifeScan's failure to
> protect the information or to seek a modification of the Protective
> Order was unreasonable.

18   Dkt. No. 336 at 10 n.5 (internal citations omitted).  If LifeScan believed that the information was

19   not properly designated confidential, LifeScan should have challenged the designation through the

20   mechanism detailed in the Protective Order.  Protective Order ¶ 6.[3]  The Protective Order

21   specifically states that "all parties shall continue to afford the material in question the level of

22   protection to which it is entitled under the Producing Party's designation until the court rules on

23   the challenge."  Protective Order ¶ 6.3.  Accordingly, LifeScan's belief that the identities were not

24   confidential, and thus not subject to the Protective Order, was not reasonable.

25        However, the Court agrees that there is not clear and convincing evidence that it was

26   unreasonable for LifeScan to believe that its issuance of the letters was in connection with its

27   prosecution of "this litigation" within the meaning of the Protective Order.   Protective Order ¶

28

---

[3] http://www.cand.uscourts.gov/stipprotectorder

United States District Court
Northern District of California

7.1. LifeScan points out that "[i]t is indisputable that if a third party who had actual notice of the injunction colluded with the Defendants to violate the injunction, that third party could be found in contempt in this litigation." Dkt. No. 352 at 16. LifeScan thus reasons that "[i]t should be likewise indisputable that it would be part of prosecuting this case for LifeScan to pursue a motion for contempt in this case against such third parties." In support, LifeScan notes:

> In the long history of Rule 65 and its common law predecessors, we have found no case finding that notice to third parties of the existence of an injunction is not for purposes of the underlying litigation and no case in which a party has been held in contempt – or even accused of contempt – for giving notice of the existence of an injunction to third parties named only in confidential documents.

*Id*. at 22. LifeScan argues that "the absence of even a prior dispute on this issue supports LifeScan's view that its conduct was – at the least – a reasonable implementation of Rule 65." *Id*.

The defendants do not address LifeScan's argument on the merits or dispute the lack of any case addressing a similar situation. Rather, the defendants' response merely notes that the Court's order to show cause already determined that LifeScan's conduct was not in connection with this litigation. Dkt. No. 367 at 10.

The Court previously indicated that it did not question the subjective good faith of LifeScan's counsel in sending the cease and desist letters. (Dkt. No. 336 at 6). It now finds that the absence of authority addressing whether notice to third parties of an injunction is "for prosecuting, defending, or attempting to settle this litigation [where the injunction was entered]" means that the Court cannot say that LifeScan's position was unreasonable by clear and convincing evidence. Given that the injunction entered in this case binds third parties acting in concert with the defendants who receive notice of the injunction and that no one disputes LifeScan's right to send cease and desist letters to third parties whose identities it knew through public sources, it was not unreasonable to believe that providing notice of the injunction to third parties was in connection with "this litigation." LifeScan's interpretation was wrong. As set forth in the order to show cause, "[t]he distributors' possible future conduct does not make them part of this action," and LifeScan's letters violated the Protective Order. But because there is no clear and convincing evidence that LifeScan did not have a good faith and reasonable interpretation of the

United States District Court
Northern District of California

5

1    Protective Order, the Court finds that LifeScan's conduct does not constitute contempt.

2       **C. Remedies for LifeScan's violation of the Protective Order**

3          LifeScan's violation of the Protective Order, while not contempt, is still sanctionable under

4    Federal Rule of Civil Procedure 37.  *See, e.g., Falstaff Brewing Corp. v. Miller Brewing Co.*, 702

5    F.2d 770, 784 (9th Cir. 1983) ("failure to obey the protective discovery order exposed counsel and

6    Falstaff to liability under Rule 37(b)(2) for the resulting costs and attorney's fees"); *Life*

7    *Technologies Corp. v. Biosearch Technologies, Inc.*, C-12-00852 WHA JCS, 2012 WL 1600393

8    (N.D. Cal. May 7, 2012) ("Rule 37 of the Federal Rules of Civil Procedure grants courts the

9    authority to impose sanctions where a party has violated a discovery order, including a protective

10   order issued pursuant to Rule 26(f)."); *see also Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,

11   685 F.3d 486, 489 (5th Cir. 2012) ("There is thus significant authority in support of the imposition

12   of Rule 37(b) sanctions for violation of Rule 26(c) protective orders.").

13          Having established that LifeScan violated the protective order, the Court must determine

14   the appropriate remedy.  The defendants assert that they are entitled to i) attorneys' fees of

15   $41,914 in connection with briefing their motion for an order to show cause and the Court's order

16   to show cause and ii) $573,149 in lost profits resulting from LifeScan's violation of the Protective

17   Order.  The defendants also ask the Court to order LifeScan to iii) send letters informing the

18   recipients of Mr. Diskant's earlier letters of the Court's contempt ruling and the reasons therefore,

19   iv) create and post a video on Lifescan's website acknowledging and apologizing for the

20   contempt, v) grant the defendants leave to conduct discovery into the scope of Lifescan's

21   contempt and the associated injury and permit further briefing regarding the same.

22       a.  Attorneys' fees

23          Defendants Decision Diagnostics Corp. and Pharmatech Solutions, Inc. assert that they

24   have incurred $23,014 in fees in connection with briefing the defendants' motion for an order to

25   show cause and the Court's order to show cause.  Dkt. No. 367-1 (Shaeffer Decl.) ¶ 2.  Defendants

26   Shasta Technologies, LLC and Conductive Technologies, Inc. assert that they have incurred

27   $18,900 in fees in connection with briefing the defendants' motion for an order to show cause and

28   the Court's order to show cause.  Dkt. No. 367-3 (Kanach Decl.) ¶ 2.  The defendants assert a total

United States District Court
Northern District of California

1   of $41,914 in attorneys' fees.  LifeScan responds that "[t]he amount of attorneys' fees that

2   Defendants expended on this motion is supported by competent evidence.  If a monetary penalty is

3   awarded, it should be limited to attorneys' fees." Dkt. No. 373-21 at 19.

4        The Court agrees that the defendants' request for attorneys' fees is supported by competent

5   evidence and GRANTS the defendants request for attorneys' fees.  Defendants Decision

6   Diagnostics Corp. and Pharmatech Solutions, Inc. are awarded $23,014 in attorneys' fees and

7   defendants Shasta Technologies, LLC and Conductive Technologies, Inc. are awarded $18,900 in

8   attorneys' fees.

9        b.   Lost profits

10       The defendants argue that the Court should order LifeScan to reimburse the defendants

11  $573,149 for lost profits from sales to four distributors that were allegedly "destroyed" as a result

12  of LifeScan's letters. Dkt. No. 367 at 16.  In support, the defendants have submitted the

13  declaration of Keith Berman, Principal Executive Officer and Chief Financial Officer of defendant

14  Decision Diagnostics and President of defendant PharmaTech Solutions.  Mr. Berman asserts that

15  the defendants received a purchase order from each of those four distributors, but "after the

16  distributor and/or the distributor's customers received a letter from Mr. Diskant, Defendants were

17  not able to realize the full benefit contemplated by the purchase order." Dkt. No. 383-3 ("Berman

18  Decl.") ¶ 8.  According to Mr. Berman, "the difference between the value of the purchase order

19  and the lessened benefit that Decision Diagnostics and PharmaTech Solutions actually received

20  because of Mr. Diskant's letters" is $573,149. *Id.*

21       LifeScan responds that two of the four distributors identified by the defendants did not

22  receive a letter that violated the Protective Order and, consequently, profits allegedly lost from

23  sales to those distributors, which the defendants allege total $311,967, should be disregarded.  As

24  for the two distributors that did receive a letter in violation of the Protective Order, LifeScan

25  asserts that the defendants have provided no competent evidence that the defendants' lost profits—

26  allegedly $261,182—are due to LifeScan's letters.  The Court addresses each argument in turn.

27       *First*, the Court agrees that sales allegedly lost to the two distributors that did not receive

28  the improper letter from LifeScan are not at issue.  One of those distributors did not receive *any*

United States District Court
Northern District of California

1   letter from LifeScan, proper or improper.  With respect to that distributor, Mr. Berman asserts "on

2   information and belief," that it "refused to perform on the purchase order because of letters sent to

3   [the distributor] and/or [the distributor's] retail partners," causing the defendants in $100,725 in

4   lost profits.  Berman Decl. ¶ 10(b), (d).

5        The defendants have not proffered any support for this assertion.  The distributor did not

6   itself receive a letter from LifeScan, and there is no competent evidence that one of its retail

7   partners received such a letter, much less that any letter sent to the retail partner violated the

8   Protective Order.  There are no declarations or communications from the distributor or its retail

9   partner.  Mr. Berman does not even disclose the supposed retail partner that received a letter from

10  LifeScan, nor does Mr. Berman identify who told him that the retail partner received such a letter.

11  The defendants have thus wholly failed to establish that LifeScan is to blame for the defendants'

12  $100,725 in lost profits to that distributor.

13       The other distributor did receive a letter from LifeScan, but it is undisputed that LifeScan

14  determined its identity through publicly available information.  *See* Dkt. No. 352 at 9.

15  Accordingly, that letter did not violate the Protective Order and, consequently, Mr. Berman's

16  unsupported assertion that the defendants lost $211,242 in profits from sales to that distributor "as

17  a direct result of Mr. Diskant's letter" is beside the point.  *Id.* ¶ 11(c).

18       *Second*, the Court also agrees that the defendants have not provided adequate evidentiary

19  support for their claims that they lost $261,182 in profits from sales to the two distributors that did

20  receive letters from LifeScan in violation of the Protective Order.  Mr. Berman asserts that the

21  distributors agreed to purchase certain quantities of GenStrips from the defendants, and that the

22  distributors "cancelled the purchase order and refused to take any further shipments in accordance

23  with its terms . . . as a direct result" of LifeScan's letters to the distributors.  Berman Decl. ¶¶ 9,

24  12.  The only evidence proffered by the defendants is Mr. Berman's bald assertion; there are no

25  declarations or communications from the distributors reflecting that the letters from LifeScan had

26  any impact on the distributors, much less that the letters caused them to cancel the purchase

27  orders.  Mr. Berman's unsupported assertion is an insufficient evidentiary basis for the monetary

28  remedies the defendants seek.  The Court DENIES the defendants' request for lost profits.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Moreover, Mr. Berman's declaration indicates that the defendants' distributors face

2    challenges selling their inventory of GenStrips—and therefore may not want additional

3    inventory—for reasons unrelated to LifeScan's letters.  Mr. Berman states that he has received

4    calls from "many" of the 8,500 independent pharmacies in the United States "demanding that

5    Defendants buy back their existing GenStrip inventory."  Berman Decl. ¶ 5.  Mr. Berman states

6    that he "do[es] not know how many of these independent pharmacies received letters from Mr.

7    Diskant."  Id.  LifeScan responds that it only sent letters to nine of the defendants' "wholesale

8    distributor[s] or online seller[s]," as LifeScan stated in its earlier briefing in response to the

9    defendants' motion for an order to show cause. Dkt. No. 373-20 ("Diskant Decl.") ¶ 4.[4]  None of

10   those entities appear to be "independent pharmacies," and the distributors that did receive the

11   improper letters are addressed above.  LifeScan's assertion that it only sent letters to nine entities

12   is consistent with the defendants' failure to provide evidence from any of the "many" independent

13   pharmacies indicating that they received a letter from LifeScan.  Accordingly, to the extent that

14   many pharmacies are demanding that the defendants buy back their existing GenStrip inventory, it

15   appears to the Court that they are doing so for reasons unrelated to the letters that LifeScan sent to

16   the two distributors that it identified from confidential information.

17       The record suggests various reasons that the defendants' distributors or pharmacies may

18   face challenges moving their inventory of GenStrips.  Defendant Decision Diagnostics' Form 10-

19   Q filed with the SEC for the quarter ending June 30, 2013 notes that "the overall at home testing

20   market is being hindered by the general poor economic conditions [and] longer payment cycles

21   from insurers." Dkt. No. 373-14 at 23.

22       In addition, LifeScan's economic expert notes that, in a departure from the usual practice

23   of a [company] selling test strips that are compatible *only* with that particular company's glucose

24   meters . . . . [t]he GenStrip is the only disposable glucose test strip that is intended for use with

25   glucose meters that are distributed by another company." Dkt. No. 373-10 ¶¶ 20-21.  The expert

26   concludes that "successfully launching such a product would require a significant investment to

27

28   [4] As noted, only two of those entities' identities were discovered through confidential information;
     the remaining seven were identified from publicly available information.

9

United States District Court
Northern District of California

1   create awareness and to educate," which the defendants have not done, instead limiting their

2   advertising to "low visibility, low-cost promotion via the Internet." *Id.* ¶¶ 22-23. The defendants'

3   apparent failure to invest in substantial marketing activities may indicate that consumer awareness

4   of the GenStrip is limited and may not support the level of consumer interest anticipated by the

5   defendants' distributors. The expert also notes that the GenStrip has received FDA approval only

6   for particular meters that were purchased before July 2010 and, as a result, the GenStrip "is not

7   approved for use with many of the OneTouch Ultra meters that are currently being used." *Id.* ¶ 29.

8       The preceding discussion is not an endorsement of LifeScan's perspective on the

9   defendants' product or marketing strategy. It does provide a plausible alternative explanation for

10  the defendants' purported lost profits. But the reason the Court will not award sanctions on this

11  basis is that defendants failed to provide sufficient evidence showing that LifeScan's conduct

12  caused them to lose profits.

13          c.   Letters and video from LifeScan explaining contempt ruling and apologizing for
                 contempt
14
        The Court DENIES the defendants' request that the Court order LifeScan to "send letters
15
    informing the recipients of Mr. Diskant's earlier letters of the Court's contempt ruling and the
16
    reasons therefore" and to "create and post a video on Lifescan's website acknowledging and
17
    apologizing for the contempt." The Court's order and the publicly filed briefing adequately
18
    explain the relevant issues for any interested parties.
19
            d.   Further discovery
20
        The defendants request leave "to conduct discovery regarding Lifescan's letter writing
21
    campaign and permit further briefing regarding actual damages caused by Lifescan's contempt."
22
    Dkt. No. 367 at 15. Mr. Berman asserts that he has received calls from "many" pharmacies
23
    demanding that the defendants buy back inventory. The defendants do not need leave of the Court
24
    to ask any of these pharmacies whether they received a letter from LifeScan. Defendants' failure
25
    to provide direct or indirect evidentiary support from the pharmacies that points to a relationship
26
    between LifeScan's conduct and defendants' alleged lost profits is significant. In light of
27
    LifeScan's assertion that it only sent letters to the nine entities already disclosed in its prior
28

1  briefing in response to the defendants' motion for an order to show cause, and the defendants'

2  failure to present any evidence to the contrary, the Court DENIES the defendants' request for

3  additional discovery.

## CONCLUSION

5       LifeScan's violation of the Protective Order is sanctionable under Federal Rule of Civil

6  Procedure 37.  LifeScan is ordered to pay defendants Decision Diagnostics Corp. and Pharmatech

7  Solutions, Inc. $23,014 in attorneys' fees, payable by LifeScan within 45 days of this Order.

8  LifeScan is ordered to pay defendants Shasta Technologies, LLC and Conductive Technologies,

9  Inc. $18,900 in attorneys' fees, payable by LifeScan within 45 days of this Order.  The Court finds

10  that LifeScan's violation of the protective order does not constitute contempt.

11       **IT IS SO ORDERED**.

12  Dated: November 6, 2013

   _____
   WILLIAM H. ORRICK
   United States District Judge

United States District Court
Northern District of California

EXHIBIT "C"

https://www.onetouch.ca/ultrateststrips



It automatically measures each blood sample not once, but twice to confirm the result. And with Code25 in every strip, it's easy to keep your meter calibrated for accuracy.

## Features

- DoubleSure® Technology automatically checks each blood sample twice to confirm the result

http://www.onetouchipp.com/products/

- The OneTouch® Ultra® Test Strip with DoubleSure®Technology automatically checks each blood sample twice to confirm the results.

http://www.officedepot.com/a/products/993478/OneTouch-Ultra-Test-Strips-Box-Of/

Features DoubleSure™ Technology that performs 2 separate glucose tests

- Compares them and then provides the results or communicates if the test was not successful.

http://www.pageinsider.com/locomotivesale-n.info

of their proven accuracy. What is "DoubleSure" Technology? "DoubleSure" is a trademarked technology of OneTouch Ultra. This term refers to the technology found within the strips. They contain two separate electrodes inside each strip. These electrodes measure the glucose concentration in each blood sample separately. The meter then compares the two measurements against one another for consistency. If the meter detects a significant difference between the two measurements, it will generate and display an error message rather than displaying a glucose value. One Touch DoubleSure technology lets you know you are getting the most accurate results available. One Touch Ultra Blue Test Strips' Leading Features: Easy to Use – One Touch Ultra Blue were designed to make glucose testing easy and convenient for anyone who uses them. DoubleSure Technology – It automatically checks each sample twice to confirm the accuracy of their results. Small Sample Size – Requires only a speck of blood (around, meaning less pain

http://diabeticaresupport.com/one-touch-test-strips/



One Touch Ultra 50
Diabetic Test Str...
lifescan
Buy New $47.99
Buy from amazon.com

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from certain sugars

http://www.slideshare.net/earningreport/q3-2009-earning-report-of-johnson-johnson

# Self-monitoring of Blood Glucose (SMBG):
# New Blue OneTouch® Ultra® Test Strips with DoubleSure™ Technology

- Automatically double-checks each result for accuracy

http://www.parentgiving.com/shop/onetouch-ultra-test-strips-4507/p/

The OneTouch Ultra Test Strips features DoubleSure™ Technology that performs two separate glucose tests. Every glucose test set is compared and the results are communicates if the test was not successful. Each test strip is

http://www.walmart.com/ip/One-Touch-Ultra-Test-Strip-25-s/5385767

## OneTouch Ultra® test strips

OneTouch Ultra® test strips give you confidence every time you check your blood sugar. That's because it's the only test strip brand to feature DoubleSure® technology — an innovation that automatically measures every blood sample not once, but twice. This is done

- Checks each blood sample twice

http://www.walgreens.com/store/c/onetouch-ultra-blue-test-strips/ID=prod6198278-product

- Automatically checks each sample twice

DoubleSure technology automatically checks each sample twice to confirm the result

check your blood sugar. That's
because it's the only test strip brand
to feature DoubleSure® technology
— an innovation that automatically
measures every blood sample not
once, but twice. This is done to

· Checks each blood sample
  twice

**DoubleSure® technology**
DoubleSure® technology automatically checks each blood
sample twice.

https://shop.riteaid.com/one-touch-ultra-test-strips-blue-50-test-strips-0330557

Touch meters. Designed with Doublesure technology, One Touch strips automatically checks the
reading twice to ensure results. Each test strip contains powerful ingredients to help provide the

brand to feature DoubleSure® technology —
an innovation that automatically measures
every blood sample not once, but twice. This is

● Checks each blood sample twice

DoubleSure® technology
DoubleSure® technology automatically checks
each blood sample twice.

http://accucheckhome.com/2013/06/09/one-touch-ultra-50-diabetic-test-strips/

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific,

http://www.healthcarestuffs.com/one-touch-ultra-50-diabetic-test-strips/

Program~Retail^ Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results

http://www.walgreens.com/store/store/product/view_product_details.jsp?id=prod1026579

• Automatically checks each sample twice

DoubleSecure technology automatically checks each sample twice to confirm the result

to feature DoubleSure® technology
— an innovation that automatically
measures every blood sample not
once, but twice. This is done to

• Checks each blood sample
  twice

https://www.southwestmedical.com/Diabetic-Products/Diabetic-Test-Strips/OneTouch-Ultra-Test-Strips/304p

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful.

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2769918/

takes 5 s and requires a small drop of blood (a minimum of 1 l). The meter contains two working electrodes to double-check each test result for accuracy, provides visual confirmation for each appropriate end-filled

https://www.diabeteshealth.com/no-bg-deal-todays-meter-innovations-leave-many-yawning-for-more/

ways 25, so after you set the code number once, you can leave it there. The strip also has something called "Double Sure Technology," which means that the glucose level is measured via two separate terminals in the strip. If the readings from the two terminals match up, the result is displayed. If they don't match up, the sample is rejected and you'll need to repeat the test. Which begs the question, shouldn't these things be accurate without having to check twice? Anyway, the meters themselves haven't changed... just the strips.

http://www.diabetesforums.com/index.php/index.html

From a web diabetes blog, diabetesforums.com;  Lifescan responding to a writer; "In regard to your message, to measure glucose, an enzyme in OneTouch Ultra Blue Test Strips reacts with the glucose. The reaction produces electrons in proportion to the glucose concentration. The electrons generate a current that is measured by electrodes. The "DoubleSure" trademark refers to a technical feature of the test strip, which has two separate electrodes. **These electrodes measure the glucose concentration in each blood sample separately. The meter compares the two measurements.** If the meter detects a significant difference between the two measurements, it generates an error message rather than a glucose value".

http://www.tudiabetes.org/forum/t/question-are-ultra-blue-true-blue-or-marketing-poo-ultra-one-touch-true-blue-test-strips/38236

The OneTouch Ultra Blue Test Strip packaging highlights an existing feature of OneTouch Ultra Test Strips called DoubleSure™ Technology that confirms each test result. The DoubleSure Technology has two separate electrodes that measure each blood sample and compares the two measurements. If the meter detects a

https://shop.riteaid.com/one-touch-ultra-test-strips-blue-50-test-strips-0330557

One Touch Ultra Test strips provide incredibly accurate blood glucose readings in unison with One Touch meters. Designed with Doublesure technology, One Touch strips automatically checks the reading twice to ensure results. Each test strip contains powerful ingredients to help provide the

http://diabetesawarenessguide.com/products/diabetes-test-strips/one-touch-ultra-50-diabetic-test-strips/

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which

From (Magellan Rx Report, pg 2 and 3, pdf, below)

ad from Lifescan for DoubleSure



It measures each blood sample not once, but
twice, to confirm your result. So you're not just

http://www.onetouch.com/onetouch-ultra-blue-test-strips

- DoubleSure® Technology
  automatically checks each blood
  sample twice.

http://www.shoponetouch.com/product/35583

- DoubleSure® Technology automatically checks each blood sample twice

OneTouch® Ultra® Blue Test Strips give you confidence every time you check your blood sugar. That's because OneTouch® Ultra® is the only brand with DoubleSure® Technology, which automatically measures every blood sample not once but twice to confirm the result. With FastDraw™ capillary action, OneTouch® Ultra® Blue Test Strips

http://www.shoponetouch.com/product/onetouch-ultra-blue-test-strips-quantity-25-test-strips

- DoubleSure® Technology automatically checks each blood sample twice

OneTouch® Ultra® Blue Test Strips give you confidence every time you check your blood sugar. That's because OneTouch® Ultra® is the only brand with DoubleSure® Technology, which automatically measures every blood sample not once but twice to confirm the result. With FastDraw™ capillary action, OneTouch® Ultra® Blue Test Strips

http://www.shoplyte.com/index.php?route=product/product&product_id=2344

- DoubleSure™ Technology automatically checks each blood sample twice.

http://www.onetouch.ca/our_products



OneTouch® Ultra®
Blue Test Strips

Inside every OneTouch® Ultra®
Blue Test Strip is DoubleSure®
Technology. It measures each
blood sample not once, but
twice to confirm the result. So
you're not just sure of your
result, you're DoubleSure®.

http://www.integer.com/lifescan

thriving. Our creative idea was born out of the
confidence a person can get only from testing
with OneTouch Ultra Blue Test strips, because
these unique strips are THE ONLY strips with
DoubleSure technology, which automatically
measures each blood sample twice to confirm
the result.

http://www.discountmedicalsupplies.com/onetouch-ultra-blue-blood-glucose-test-strip-by-lifescan.html

- DoubleSure™ Technology automatically checks each blood sample twice.

http://www.medicalsupplygroup.com/p-17060-onetouch-ultra-test-strips.aspx

The OneTouch® Ultra® Blue Test Strips have DoubleSure® Technology which automatically checks each blood sample twice to confirm the result. OneTouch®

http://www.ultmedical-supply.com/lifescan-strips-onetouch-ultra-test-strips.html

LifeScan Strips: OneTouch Ultra Test Strips. Features DoubleSure Technology that performs two separate glucose tests, compares them. and then provides the results or communicates if the test was not successful. Each test strip is glucose

http://www.directionsforme.org/item/2608538

Double Sure® technology automatically checks each sample twice to confirm the result.

http://www.ultrateststrips.com/onetouch-meters/12-why-use-ultra-test-strips.html

Our DoubleSure™ Technology automatically checks each
sample twice to confirm the result.

provide the user with efficient results. LifeScan's **Double Sure Technology** will also automatically check each of your blood samples twice. One Touch Ultra Test Strips are simple, fast, and efficient.

http://chckansas.coventryhealthcare.com/web/groups/public/@cvty_regional_chcks/documents/document/c079536.pdf

 **The test strip with a second opinion built right in.**
Inside every OneTouch® Ultra® Blue Test Strip is DoubleSure™
Technology. It measures each blood sample not once, but twice.
So you're not just sure of your result—you're DoubleSure™.

http://www.ultra2glucosemeter.com/ultra2-glucose-test-strips

One Touch Ultra Blue Test Strips by LifeScan use DoubleSure Technology to automatically check the blood sample twice to ensure the user is getting an incredibly accurate test result. This makes

## One Touch Ultra Blue Test Strips feature

- LifeScan's patented DoubleSure Technology that automatically check each blood sample a second time to confirm the blood glucose results

http://www.medicalexpo.com/prod/lifescan/product-71126-513860.html

The DoubleSure Technology ensures accuracy and precision as it checks the blood sample twice to endorse the readings.

DoubleSure™ Technology automatically checks each blood sample twice.

http://www.shopping.com/xSBS-lifescan-onetouch-ultra-test-strips-blue-100-count-pack-of-1-lifescan-one-touch-ultra-blue-100-count~PRDLT-126591962-174821812?sb=1

Remote. DoubleSure Technology automatically checks each sample twice to confirm the result.

http://www.medline.com/jump/product/x/Z05-PF46220

DoubleSure™ Technology automatically checks each blood sample twice.

https://www.diabetescarecommunity.ca/manufacturers/lifescan-canada-ltd/

- DoubleSure®
Technology automatically
measures each blood
sample not once but
twice. So you're not just
sure of your result-you're
DoubleSure®.

http://www.arizonadiabeticsupplies.com/onetouch-ultramini-glucose-meter-by-lifescan

be used at any time and any place. The One Touch UltraMini Meter works with the
One Touch Ultra Blue Test Strips. With DoubleSure Technology, it automatically
checks each blood sample twice eliminating falsely elevated results.

http://www.tophealthystore.com/product/one-touch-ultra-50-diabetic-test-strips/

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful.

http://www.mdon.co.kr/news/article.html?no=2220

원터치 브랜드의 모든 시험지 제품은 고유의 이중 측정 방식(Double Sure Technology™)적용으로 보다 전문적이며 정확한 측정이 가능히며, 원터치 패스트 드로(OneTouch Fast Draw™)기술이 적용되어 있어, 소량의 혈액만으로 5초 안에 빠르게 혈당 측정 결과를 확인할 수 있을 뿐 아니라 혈액 내 포도당(글루코스) 에만 반응하는 제품으로 정확합니다.

http://13.31.155.104.bc.googleusercontent.com/brand/OneTouch+Ultra/

OneTouch Ultra Sure Test Strips, 100 ea
Description: For blood glucose testing with the OneTouch Ultra family of meters and the OneTouch Ping meter remote. u  Requires just a speck of blood 3 DoubleSure technology automatically checks each sample twice to confirm the result 6 Proven accuracy 7 Contains 2 vials of 50 test strips

OneTouch (R) Ultra (R) Test Strips, Box Of 100
Description: Features DoubleSure (TM) Technology that performs 2 separate glucose tests Compares them and then provides the results or communicates if the test was not successful.

OneTouch (R) Ultra (R) Test Strips, Box Of 50
Description: Features DoubleSure (TM) Technology that performs 2 separate glucose tests Compares them and then provides the results or communicates if the test was not successful.

OneTouch Ultra Blue Test Strips - 100 ea
Description: For Blood Glucose Testing With The Onetouch Ultra Family Of Meters And The Onetouch Ping Meter Remote  Requires Just A Speck Of Blood Doublesure Technology Automatically Checks Each Sample Twice To Confirm The Result Proven Accuracy Contains 2 Vials Of 50 Test Strips Made In Usa

https://rodriquezrussell17.wordpress.com/one-touch-ultra-50-diabetic-test-strips/

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from

http://clickercoach.com/a/p/onetouch-ultra-test-strips-box-of-50

Features DoubleSure (TM) Technology that performs 2
separate glucose tests Compares them and then provides the
results or communicates if the test was not successful. Each

https://drive.google.com/file/d/0B4MMANIghCnJQkxZZTNvazlwaWc/view?pref=2&pli=1

NEW! OneTouch® Ultra® Blue Test Strips
Features DoubleSure Technology that performs two
separate glucose tests, compares them, and then provides the results or
communicates if the test was not successful. Each test strip is glucose specific,

http://www.diabetesforums.com/forum/topic/48314-onetouch-ultra-blue-test-strips/page-2

I emailed Lifescan about the strips, Just got the response:

Quote

In regard to your message, to measure glucose, an enzyme in OneTouch Ultra Blue Test Strips reacts with the glucose. The reaction produces
electrons in proportion to the glucose concentration. The electrons generate a current that is measured by electrodes. The "DoubleSure"
trademark refers to a technical feature of the test strip, which has two separate electrodes. These electrodes measure the glucose concentration
in each blood sample separately. The meter compares the two measurements. If the meter detects a significant difference between the two
measurements, it generates an error message rather than a glucose value.

The double-electrode feature has been present in Ultra test strips since their original market introduction in 2001. LifeScan created the
DoubleSure™ trademark to emphasize this aspect of the test strips.

https://www.yourdiabeticsupplier.com/products/onetouch-ultra-test-strips

The OneTouch Ultra Test Strips give you confidence every time you test your blood
glucose levels. The reason is because OneTouch Ultra is the only brand in the
market with DoubleSure Technology, which means it automatically measures every
blood sample not once but 2 times to confirm results.

DoubleSure™ Technology automatically checks each

sample twice to confirm the result.

https://issuu.com/felixbatista/docs/one_touch_ultra_50_diabetic_test_strips

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is

http://www.totalhomemedical.com/lfs020245xx.html

Features DoubleSure™ Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from certain sugars contained in some medicines patients may

http://www.wegmans.com/webapp/wcs/stores/servlet/ProductDisplay?productId=697695&storeId=10052&langId=-1

1 vial of 25 test strips. Proven accuracy. DoubleSure technology. For blood glucose testing with the OneTouch Ultra family of meters and the OneTouch Ping meter remote. DoubleSure technology automatically checks each sample twice to confirm the result. Requires just a speck

http://www.onetouchultrameters.com/onetouch-test-strips/onetouch-ultra-test-strips.html

Featuring DoubleSure™ technology that checks the blood sample twice for absolute accuracy. The ultra blue has technology that eliminates false results

http://www.buyemp.com/product/lifescan-onetouch-ultra-test-strips

• DoubleSure Technology automatically checks each sample twice to confirm the result

http://www.lifescandiabeticsupplies.com/test-strips/onetouch-ultra-blue-test-strips.html

The Ultra Blue Strips come with the DoubleSure Technology that automatically checks each sample a second time to be double sure. With a confirmation window you can be sure you have applied

http://www.onetouch.com/professional/products/onetouch-ultra-blue-test-strips



DoubleSure™ Technology automatically checks each sample twice to confirm the result.

http://www.onetouchasia.com/sg/en/content.php?c=29&sc=34&p=78

Use of **two working electrodes** allows two identical measurements to be compared and checked, leading to accurate glucose results

http://www.onetouchasia.com/ph/en/content.php?c=29&sc=34&p=78

Use of **two working electrodes** allows two identical measurements to be compared and checked, leading to accurate glucose results

https://sites.google.com/site/dayofhealth143s/onetouch-ultra-test-strips

Parts/Equipment Online Medical Supply Features DoubleSure™ Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from certain sugars

https://onetouchultrateststriipsprices92.wordpress.com/

"DoubleSure" is a trademarked engineering of OneTouch Ultra. This phrase refers to the systems discovered inside of the strips. They include two independent electrodes in every one strip. These electrodes consider the glucose concentration in every single and every single blood sample individually. The meter then compares the two measurements in opposition to one one far more for consistency. If the meter detects a sizeable variation amongst the two measurements, it will make and demonstrate an error notion fairly than displaying a glucose price. One particular Get in touch with

http://www.sciencedirect.com/science/journal/09565663/74/supp/C

☐ Investigating pipeline and state of the art blood glucose biosensors to formulate next steps Review Article
Pages 243-262
Anthony G.A. Aggidis, Jeffrey D. Newman, George A. Aggidis
▷ Abstract   ▽ Close research highlights   📄 Purchase PDF - $39.95

Highlights

- State of the art and pipeline devices for diabetes and glucose sensing.
- Future research direction in the field of glucose sensing for diabetes.
- Emphasis on the user friendly home blood glucose testing market.
- Technological advancement such as incorporation of the Internet of Things.
- Future technologies supporting closed loop systems.

http://www.compare2buy.ml/OneTouch-R-Ultra-R-Test-Strips-Box-Of-50.html

Features DoubleSure (TM) Technology that performs 2 separate glucose tests Compares them and then provides the results or communicates if the test was not successful. Each test strip is glucose specific which prevents false reads from

http://p350.com/?product=one-touch-ultra-50-diabetic-test-strips

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from certain sugars

http://www.vitalitymedical.com/onetouch-ultra-fastdraw-design-test-strips.html

Onetouch Ultra Fastdraw Design Test Strips provide for easier blood sampling that requires just a speck of blood that is automatically drawn into the test strip. A visual confirmation window shows you if there is enough blood for an accurate reading. For use with One Touch Ultra and One Touch UltraSmart meters, features DoubleSure™ Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful.

http://www.tophealthystore.com/product/one-touch-ultra-50-diabetic-test-strips/

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from certain sugars

http://www.boston-medical-supply.com/medical-supply-products/diabetic/strips/lifescan-strips-onetouch-ultra-test-strips.html

LifeScan Strips: OneTouch Ultra Test Strips. Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific,

http://www.boston-medical-supply.com/medical-supply-products/diabetic/strips/lifescan-strips-onetouch-ultra-test-strips.html

LifeScan Strips: OneTouch Ultra Test Strips. Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific,

https://www.diabeteshealth.com/no-bg-deal-todays-meter-innovations-leave-many-yawning-for-more/

ways 25, so after you set the code number once, you can leave it there. The strip also has something called "Double Sure Technology," which means that the glucose level is measured via two separate terminals in the strip. If the readings from the two terminals match up, the result is displayed. If they don't match up, the sample is rejected and you'll need to repeat the test. Which begs the question, shouldn't these things be accurate

http://13.31.155.104.bc.googleusercontent.com/brand/OneTouch+Ultra/

**Description:** For blood glucose testing with the OneTouch Ultra family of meters and the OneTouch Ping meter remote. ul Requires just a speck of blood 3 DoubleSure technology automatically checks each sample twice to confirm the result 6 Proven accuracy 7 Contains 2 vials of 50 test strips;

https://rodriquezrussell17.wordpress.com/one-touch-ultra-50-diabetic-test-strips/

Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific, which prevents false reads from

http://clickercoach.com/a/p/onetouch-ultra-test-strips-box-of-50

Features DoubleSure (TM) Technology that performs 2 separate glucose tests Compares them and then provides the results or communicates if the test was not successful. Each

https://drive.google.com/file/d/0B4MMANIghCnJQkxZZTNvazlwaWc/view?pref=2&pli=1

NEW! OneTouch® Ultra® Blue Test Strips
Features DoubleSure Technology that performs two separate glucose tests, compares them, and then provides the results or communicates if the test was not successful. Each test strip is glucose specific,