**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| PHARMA TECH SOLUTIONS INC., et al., | Case 2:16-cv-00564-RFB-PAL |
| Plaintiffs, | |
| v. | **OPINION & ORDER** |
| LIFESCAN INC., et al., | |
| Defendants. | |

## I. INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 67). For the reasons discussed below, the Motion for Summary Judgment is granted.

## II. BACKGROUND

This is a patent infringement case involving two competitors in the market for blood glucose monitoring. Plaintiff contends that Defendant infringed upon two of its patents for blood glucose monitoring test strips, U.S. Patent No. 6,153,069 ("the '069 Patent") and U.S. Patent No. 6,413,411 ("the '411 Patent").[1] Defendant LifeScan is a leader in the market for glucose monitoring systems. Defendants LifeScan, Inc. and LifeScan Scotland, Ltd. are subsidiaries of Johnson & Johnson. The allegedly infringing product is LifeScan's OneTouch Ultra glucose

---

[1] The '411 Patent was a continuation of the '069 and for purposes of this case is essentially the same. Therefore, the Court will consider the infringement claims together.

monitoring system. Plaintiff Pharma Tech develops, markets and distributes affordable medical diagnostic tools to home users. In and around 2011, Pharma Tech was part of a group that developed a glucose test strip known as "GenStrip." The GenStrip was cleared for sale in the United States by the FDA on November 30, 2012. The GenStrip is compatible with Lifescan's One Touch Ultra line of meters and, at the time, was the only third-party strip cleared by the FDA for use in Lifescan's meters. Pharma Tech's parent corporation bought the '069 and '411 patents in 2015 for $250,000.

Plaintiff filed the complaint in this case on March 14, 2016 claiming both literal infringement and infringement under the Doctrine of Equivalents ("DOE"). (ECF No. 1). Defendant filed a Motion to Dismiss on June 21, 2016. (ECF No. 34). This Court held a hearing on March 13, 2017 in which it: (i) allowed Pharma Tech to file an amended complaint; (ii) ordered expedited discovery, limited to the issue of infringement for the claim elements at issue on the motion to dismiss, and (iii) invited LifeScan to move for summary judgment after this limited discovery was completed. (ECF No. 50). Plaintiff filed an Amended Complaint on April 3, 2017. (ECF No. 49). The parties entered a stipulation to dismiss Plaintiff's literal patent infringement claims on May 10, 2017. (ECF No. 58). Defendant filed the instant Motion for Summary Judgment on July 24, 2017. (ECF No. 67). Plaintiff responded on August 28, 2017. (ECF No. 69). Defendant replied on September 18, 2017. (ECF No. 73).

### III. THE PATENTS & THE ALLEGED INFRINGING PRODUCTS

#### A. The '069 AND '411 Patents

Pharma Tech alleges infringement of its '069 and '411 patents. The '069 and '411 patents have the same inventors. The '411 patent is a continuation of the '069 patent, and thus has the same written description or "specification."

The '069 and '411 patents describe a system for measuring blood glucose levels. The system uses a sensor, which is inserted into a meter and whetted by a "sample fluid" (e.g. blood). The meter then "imposes a known potential across the [sensor's] electrodes and measures the resulting . . . current at specific time points." Current measurements are converted by a microprocessor into equivalent glucose concentrations. According to Pharma Tech, the novel feature of the '069 and '411 patents is a system for performing a safety check to detect errors in blood glucose readings. The system covered by the '069 and '411 patents performs the safety check by taking and comparing two different glucose concentration readings before reporting a result to the user.

The claims of the '069 and '411 patents refer to "Cottrell current readings." As described in the patents, Cottrell current readings are readings of "electric current [that] decay [i.e., lessen] with time in accordance with [a known equation]." To facilitate the claimed comparison in the '069 and '411 patents, two Cottrell current readings are taken at different times, with the later reading "occurring at a second predetermined time following the first predetermined time." The Cottrell current readings are then "converted . . . to equivalent glucose . . .concentrations." Those glucose concentrations are compared to see whether they are within a prescribed percentage of each other. According to the patents, "[r]esults outside of the acceptable limits would indicate some problem with the system."

The initial patent application for the '069 patent overcame various rejections by the PTO. After responding to the PTO's rejections and amending the claims, the applicant's accepted claims of '069 and '411 patents all include limitations teaching a method for creating and comparing separate measurements of "analyte concentration." For example, claim 1 of the '069 Patent discloses:

> "[a] microprocessor means for *converting* the first Cottrell current reading into a *first analyte concentration* measurement using a calibration slope and an intercept specific for the first Cottrell current measurement, for converting the at least one additional Cottrell current reading into an *additional analyte concentration* using a calibration slope and an intercept specific for the at least one additional Cottrell current measurement, and for *comparing the first analyte concentration measurement with the at least one additional concentration measurement* to confirm that they are within a prescribed percentage of each other"'069, 13:48-59 (emphasis added).

Claim 4 teaches "A device for obtaining measurements of an *analyte* contained in a sample in order to determine the *concentration of analyte* in the sample." '069, 14:6-8 (emphasis added). Claim 5 and Claim 6 assert "A system for obtaining measurements of *analytes* contained in a sample in order to determine the *concentration of the analyte* in the sample." '069, 14:52-54, 15:33-35 (emphasis added). The Court thus finds that all of the independent claims of the '069 patent (and the '411 patent) require or reference a device or system for measuring "analyte concentration."[2]

### B. LifeScan's Allegedly Infringing System

The LifeScan system does not compare "analyte concentration." Rather, the LifeScan system conducts its safety or quality check on the two samples by comparing "electric currents" that are measured at two separate electrodes to determine if those electric current measurements are within a specified range of each other. Only after determining by a particular algorithm that the two current measurements are sufficiently close to each other does the LifeScan system then combine the currents into a single glucose concentration measurement. The LifeScan system does not compare separate concentration measurements. Rather it generates only one measurement

---

[2] The '411 similarly references systems for measuring analyte concentration. '411, 13:40-50 (claim 1), 14:26-37 (claim 4), 15:5-19 (claim 7) and 16:17-29 (claim 8).

after conducting a validity check based upon the comparison of the two electric current measurements.

**IV.   LEGAL STANDARD**

Plaintiff brings its infringement claims under the "doctrine of equivalents." Pozen, Inc. v. Par Pharm., Inc., 696 F.3d 1151, 1167 (Fed. Cir. 2012). In order to establish infringement under the "doctrine of equivalents" a patentee must "prove that the accused device contains an equivalent for each limitation not literally satisfied." Wi-Lan, Inc. v. Apple, Inc., 811 F.3d 455, 463 (Fed. Cir. 2016).

Defendant argues that Plaintiff's infringement claims are barred by both amendment-based and argument-based prosecution history estoppel. Under the doctrine of amendment-based estoppel, an amendment during patent prosecution that narrows a claim for reasons of patentability is "presumed to be a general disclaimer of the territory between the original claim and the amended claim." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 740 (2002). "[T]he presumption [is] that the patentee has surrendered all territory between the original claim limitation and the amended claim limitation." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1365 (Fed. Cir. 2003) (en banc). There are three ways a patentee can rebut the Festo presumption, once it has been established. The only one at issue here is the "tangential relation" exception, which creates an exception where "the rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question." Id. The applicability of the "tangential relation" exception is a question of law for the court to decide "on the basis of the public record [from the prosecution history]." Biagro Western Sales, Inc. v. GrowMore, Inc., 423 F.3d 1296, 1306 (Fed. Cir. 2005). In considering this exception, the court "ask[s] 'whether the

reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent.'" Integrated Tech. Corp. v. Rudolph Techs., Inc., 734 F.3d 1352, 1358 (Fed. Cir. 2013) (quoting Festo, 344 F.3d at 1369). The inquiry "'focuses on the patentee's objectively apparent reason for the narrowing amendment,' which 'should be discernable from the prosecution history record.'" Id. (quoting Festo, 344 F.3d at 1369). If a tangential rationale for the amendment "is not objectively apparent from the prosecution history" then the patent owner has not met its burden on the issue. Id.

Prosecution history estoppel can also occur where an applicant surrenders "claim scope through argument to the patent examiner ('argument-based estoppel')." Voda v. Cordis Corp., 536 F.3d 1311, 1325 (Fed. Cir. 2008). "[A]n applicant can make a binding disavowal of claim scope in the course of prosecuting the patent, through arguments made to distinguish prior art references. Such argument-based disavowals will be found, however, only if they constitute clear and unmistakable surrenders of subject matter." Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1177 (Fed. Cir. 2008). "'[T]he relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter.'" PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1368 (Fed. Cir. 2007) (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1583 (Fed. Cir. 1995)). The presumption of surrender "applies to all claims containing the [added] [l]imitation, regardless of whether the claim was, or was not, amended during prosecution." Felix v. Am. Honda Motor Co., 562 F.3d 1167, 1182-83 (Fed. Cir. 2009) (internal citations and quotations omitted). Therefore, if a subsequent patent is a continuation of a patent that surrendered the scope of a claim, the claim scope is surrendered in the subsequent patent as well.

/ / /

/ / /

## IV. ANALYSIS

### A. Prosecution History of the '069 Patent[3]

The application giving rise to the '069 Patent was filed on February 9, 1995. The original language of Plaintiff's disputed claim dislcosed a means for "creating an electric circuit between [a] first electrode and [a] second electrode through [a] sample," "measuring Cottrell current through said sample" and "visually displaying results of said measurement." Plaintiff admits that the claims attached to the original application were broad enough to essentially cover any test strip with two electrodes. In an Office Action dated March 21, 1997, the examiner rejected the claims with reference to prior art that also featured two working electrodes.

On October 27, 1997, the applicant responded to the rejection with a Response to Office Action. The applicant amended certain claims (4, 17, 66-69) and cancelled the rest. The applicant made the following amendment to claim 4 (underlined text is new):

> e) means for measuring <u>a first</u> Cottrell current reading through said sample <u>at a first predetermined time after said electrical potential is applied and for obtaining at least one additional Cottrell current reading through said sample, said at least one additional Cottrell current reading occurring at a second predetermined time following said first predetermined time,</u>
> f) <u>means for converting said first Cottrell current reading into a first analyte concentration measurement, and for converting said at least one additional Cottrell current reading into an additional analyte concentration measurement, and for linearly comparing said first analyte concentration measurement to said additional analyte concentration measurement</u>…

This language was also rejected by the examiner and was further refined over a series of amendments, but the language concerning "converting" at least two Cottrell current readings to "analyte concentration" measurements and "comparing the first analyte concentration measurement with the at least one additional concentration measurement" remained in the final approved '069 Patent.

---

[3] If Plaintiff surrendered the infringement claim in the prosecution of the '069 Patent, it surrendered the claim in the '411 Patent as well. <u>Felix</u>, 562 F.3d at 1182-83. For this reason, the Court only needs to look to the prosecution history of the '069 Patent in analyzing infringement.

In attempting to distinguish its claims from prior art, the applicant made the following arguments concerning the comparison of *multiple analyte concentration readings* during the course of patent prosecution:

- In supporting its October 27, 1997 amendment, the applicant argued, "Pollman likewise does not suggest the present claimed means for ***comparing the concentration*** derived from the first measurement and at least one additional ***concentration*** derived from an additional measurement to verify the results." '069 Prosecution History at 069PH_00000131-132. (emphasis added).
- In that same submission, the applicant distinguished Szuminsky '564 on the grounds that the claimed invention "verif[ies] the result by ***comparing concentrations*** determined at different times during the measurement." '069 Prosecution History at 069PH_00000132. (emphasis added).
- In the remarks section to the September 27, 1999 amendment, the applicant noted that the Walling and Szuminsky patents "do not. . . disclose taking multiple ***analyte concentration measurements and comparing such***…" 069 Prosecution History at 069PH_00000199. (emphasis added).
- In support of its May 12, 2000 Amendment, the applicant distinguished the White patent by arguing: "That operation in White ('516) differs from the present invention in the following respects. First, in the present invention the two different Cottrell current readings are ***converted into first and second analyte concentration measurements***. Further, in the present invention the ***first and second analyte concentration measurements based on the first and second current readings are compared to each other*** to confirm that they are within a prescribed percentage of each other…" '069 Prosecution History at 069PH_00000219-220. (emphasis added).
- In that same submission, the applicant argued that the Walling patent "does not . . . compare the first and second analyte concentration measurements to each other, as in the present invention." '069 Prosecution History at 069PH_00000219-220.

Plaintiff points out that the applicant also distinguished its claims from the White patent by arguing that "White discloses determining whether a Cottrell current reading is proper by a complicated mathematical inverse ratio of the times square root. In contrast to the teachings in White the present invention compares analyte concentration readings at different times." '069 Prosecution History at 069PH_00000200. They argue that it was the linear comparison of the two readings, as compared to White's "complicated mathematical inverse ratio of the times square root" that was the primary focus of their differentiation from White, rather than the conversion to and comparison of analyte concentration measurements.

### B. Amendment-Based Estoppel

Defendants argue that when the applicant to the '069 Patent amended its application to add the language requiring the conversion from Cottrell current readings to analyte concentration measurements and the comparison of those concentration measurements, they surrendered any claims to infringement based on patents that do not compare analyte concentration measurements. As their patent compares Cottrell current readings, rather than analyte concentration measurements, they argue that Plaintiff surrendered the territory—where their invention exists—between the original claim and the amended claim. Plaintiff argues that the comparison of analyte concentration measurements was tangential to the real purpose of the amendment, which was to require a linear comparison of multiple measurements, and therefore they did not surrender claims to equivalents that do not include analyte concentration comparisons. This is a question for the Court to decide based on the prosecution history record. Biagro, 423 F.3d at 1306. The Court finds that Plaintiff has not overcome the Festo presumption and agrees with the Defendant that summary judgment is appropriate.

When the '069 Patent applicant amended its claim from simply measuring Cottrell current through two electrodes to requiring the conversion of Cottrell current readings to analyte concentration measurements and comparing the measurements, they established a presumption that they surrendered all territory between those two claims. Festo, 344 F.3d at 1365. As Defendant's patent compares two Cottrell currents, but does not convert those currents to analyte

concentration measurements before performing the comparison, there is a presumption that Plaintiff surrendered its claim to the type of invention taught in Defendant's patent. That is because the initial application for the '069 patent did not distinguish between measurements of current versus measurements of analyte concentration. The primary independent (and dependent) claims (Claims 1-17, 58-60 and 65-69) in the initial application were rejected as being obvious and anticipated by prior art. The examiner's rejection on March 10, 1997 relied upon prior art from U.S. Patent No. 5,385,846 to Kuhn ("Kuhn"), U.S. Patent No. 5,288,636 to Pollman ("Pollman") and U.S. Patent No. 5,108,564 to Szuminsky ("Szuminsky"), which similarly taught inventions involving two electrodes with sensors measuring electric currents across testing strips.

Plaintiff argues that the language regarding the conversion to analyte concentration measurements was merely tangential to the overall purpose of the amendment. However, this tangential rationale is not "objectively apparent from the prosecution history. " <u>Integrated Tech. Corp.</u>, 734 F.3d at 1358 (quoting <u>Festo</u>, 344 F.3d at 1369). Although Plaintiff points to arguments made during prosecution that differentiated between the '069 Patent applicant's claims and prior art – the White patent in particular – based on the linear comparison of two measurements, the '069 Patent applicant also consistently relied on the comparison of two *analyte concentration measurements* as a distinguishing feature of its claims.

Furthermore, as Plaintiff points out that White was not one of the prior art references relied upon by the examiner in the original rejection that led to the analyte comparison amendment Defendant focuses on. Instead, the examiner pointed to three existing patents, U.S. Patent No. 5,385,846 to Kuhn ("Kuhn"), U.S. Patent No. 5,288,636 to Pollman ("Pollman") and U.S. Patent No. 5,108,564 to Szuminsky ("Szuminsky"), which already featured two working electrodes. As discussed above, in supporting the October 27, 1997 amendment that is the focus of Defendant's argument, the applicant differentiated Pollman because it "does not suggest the present claimed means for comparing the concentration derived from the first measurement and at least one additional concentration derived from an additional measurement to verify the results" and Szuminsky on the grounds that the claimed invention "verif[ies] the result by comparing concentrations determined at different times during the measurement." '069 Prosecution History

at 069PH_00000131-132. This explanation did not emphasize a "linear comparison" of measurements or a unique mathematical formula or unique algorithm. Rather, based on Plaintiff's own analysis of the prosecution history, White's "complicated mathematical inverse ratio of the times square root" was not the focus of the amendment that originally added the conversion and comparison of analyte concentration measurements. This is further evidence that the comparison of *analyte concentration measurements* was, at a minimum, a significant aspect of the amendment, rather than merely tangential to the linear comparison of multiple measurements. Based on this record, Plaintiff has not overcome the presumption of surrender based on the narrowing amendment and the Court finds that amendment-based estoppel is appropriate. As Plaintiff surrendered this claim in the '069 Patent and the '411 Patent was a continuation of the '069 Patent, Plaintiff has surrendered the claim in the '411 Patent as well. Felix, 562 F.3d at 1182-83.

### C. Argument-Based Estoppel

The Court incorporates by reference its earlier analysis and findings from this Order regarding amendment-based estoppel to the analysis here. The same excerpts from the record that support the finding that the comparison of analyte concentration measurements was not merely tangential to the '069 Patent applicant's amendments also establish the applicability of argument-based estoppel to the Plaintiff's claims in this litigation. In prosecuting the patent, the '069 Patent applicant consistently referenced the conversion to and comparison of analyte concentration measurements. Based on these statements, it would have been reasonable for a competitor to believe that the '069 Patent applicant had surrendered the territory in question. PODS, Inc. v. Porta Stor, Inc., 484 F.3d at 1368. Therefore, the Court finds that argument-based estoppel is applicable as well.

### V. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 67) is GRANTED.

**IT IS FURTHER ORDERED** the Clerk of the Court shall enter judgment accordingly and close this case.

**DATED**: October 23, 2018.

_____
**RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE**